[This decision has been published in *Ohio Official Reports* at 95 Ohio St.3d 31.]

THE STATE EX REL. OSCO INDUSTRIES, INC., APPELLANT, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Osco Industries, Inc. v. Indus. Comm*., 2002-Ohio-1630.]

*Workers' compensation—Industrial Commission did not abuse its discretion in authorizing surgery to alleviate claimant's pain, which self-insured employer refused to authorize, when.*

(No. 99-226—Submitted January 29, 2002—Decided April 10, 2002.)

APPEAL from the Court of Appeals for Franklin County, No. 97APD11-1443.

_____

*Per Curiam.*

{¶ 1} Appellee-claimant Gary Neal injured his back in 1990 in an industrial accident. His workers' compensation claim was allowed for, among other things, ruptured disc L5-S1. Surgery was recommended in 1992, and, in 1993, claimant's self-insured employer, appellant Osco Industries, authorized it. Unfortunately, a previously undetected heart condition—which later became part of the claim—prevented the procedure at that time.

{¶ 2} Claimant continued to be in significant pain. On February 15, 1996, he consulted with Dr. Gary L. Rea at the Ohio State University Spine Center. Dr. Rea wrote:

{¶ 3} "This started back on 3/6/90. At that time, he had a work-related injury. Since that time, he has had multiple evaluations, and has been set up for surgery at least once and—and it sounds like maybe even twice. For one reason or another, these have been cancelled.

{¶ 4} "In any case, he has a constant dull ache across his back. He also has significant pain going down the back part of his right leg with numbness in an S1 distribution. * * *

**{¶ 5}** "* * *

**{¶ 6}** "His exam shows an absent right ankle jerk. This could not even be increased with Jendrassik's maneuver. His left ankle jerk, however, was present and increased slightly with Jendrassik's. Left straight leg raising at 90 degrees caused pain in the back. Bent leg raising on the left caused some pain in the right low back. Straight leg raising on the right caused pain in his right back, right buttock and down his right leg. Bent leg raising caused pain in his right leg. He has positive Waddell signs, positive simulation and tenderness. He did not have significant overreaction to pain, but did have tenderness in his back. Flexion caused him pain quickly and extension caused him low back pain.

**{¶ 7}** "His MRI scan shows probable herniated disc at L5-S1 on the right side.

**{¶ 8}** "This man presents with a significantly difficult problem. He has symptoms that he describes that are very clear-cut and sound as if they are an S1 radiculopathy. His exam is also consistent with an S1 radiculopathy, but he also has evidence of chronic pain behaviors. He also has a rather small herniated disc at S-1.

**{¶ 9}** "If I had seen this man six months or a year after this then I would be inclined to treat him conservatively a little longer. However, at six years after the incident with continued pain in an S1 radiculopathic pattern, I think it is reasonable to do a discectomy at S-1.

**{¶ 10}** "I spent a long time talking with him about this. I discussed the risks of surgery including death, paralysis, infection, bleeding, increased pain, lack of pain relief and need for further surgery. I also discussed with him the fact that this may not relieve his pain. I told him that I thought he had about a 60% to 70% chance of having significant relief of his pain. This is not quite the same as a flip of the coin, but it is not as good as most people. The primary problem is this long-term pain that he has had.

**{¶ 11}** "* * *

**{¶ 12}** "I discussed with him and outlined two options. The first is to apply for disability, refuse to have any surgical procedures since its likelihood is low, and then just go on with whatever happens there. The other option is to have the surgery. He appears to understand the risks involved and also understands the fact that after this, I do not think he will be 100% disabled, but he may have some disability. I also told him that it will not relieve all of his pain since the muscle tenderness will not be relieve[d] from this.

**{¶ 13}** "I explained to him that I think these are two reasonable options.

**{¶ 14}** "After discussing them, he requested that we pursue a surgical course. His feeling is that he suffers so much from the pain in his buttock and down his leg, that he wants to take the option of attempting a surgical procedure in order to hopefully alleviate his pain. I understand that and think that's a reasonable option in this man. I think he also understands the different options and the percentages that I believe that he has in getting some pain relief.

**{¶ 15}** "* * *

**{¶ 16}** "I am very hopeful this will help this young man. It certainly has been a difficult time for him and I wish I could be more optimistic, but I think that a 70% chance is a reasonable estimate of the chances of him having improvement in his pain."

**{¶ 17}** Claimant elected to have surgery and Osco's actuarial service representative, Hunter Consulting Company, approved it. That authorization was reconfirmed on July 23, 1996. However, seven weeks later, Hunter revoked its authorization, requiring a new application and asserting its right to its own medical examination.

**{¶ 18}** Osco scheduled an examination with Dr. Thomas A. Bender, who reported:

**{¶ 19}** "The patient complains of primarily back pain which is on a constant basis. He has some element of daily leg pain. The patient states the back pain predominates over the leg pain. The patient describes leg pain on a stocking type pattern to the entire right foot. He has a focus of irritability in the right hip but does have a paresthesia pattern involving all five toes. Additionally, the patient states he now has buttock pain going into the left side. * * *

**{¶ 20}** "* * *

**{¶ 21}** "* * * Radiographic evaluation of the lumbar spine revealed evidence of some facette hypertrophy of the lumbo-sacral junction. The sacroiliac joints are not necessarily sclerotic. There is some relative retrololisthesis of the L5 vertebral body on the sacrum. Bone density is slightly osteopenic.

**{¶ 22}** "* * *

**{¶ 23}** "* * * I do not consider the patient a good surgical candidate. There have been multiple studies obtained over the years which have been hard pressed to reveal significant disc pathology. At this time, lumbar disc degeneration is present at L5-S1. A discogram verifies that area as pathological. Facette hypertrophy is also recognized. There have been several MRI scans which vary with regard to the amount of disc pathology recognized at L5-S1. * * * His examination is equivocal. Specifically, I do not see reflex asymmetry which Dr. Rea has ascertained. Considering the time from injury now being seven years, and the patient has been recognized to be a chronic pain personality, it is doubtful whether surgical intervention will reduce his pain, reduce his narcotic intake, increase his clinical function or reverse his current clinical disability. I base this upon the time that we are remote from the incident in terms of seven years. The patient has a complaint primarily of mechanical low back pain. The patient's right leg radicular complaint is nonspecific and not clinically verified to be isolated to only one root. He describes at least a two if not three root paresthesia pattern and his muscular weakness involves more than one nerve root level. Coupled with these

factors is the recognition that various imaging studies have been relatively insensitive towards significant disc pathologies to cause a radiculopathy.

**{¶ 24}** "It is my opinion that the patient's physical examination is somewhat emotionally generated. Based upon the available imaging studies, it is my opinion that the patient's current back condition does not prohibit him from participating in sustained remunerative employment. The patient does have documented disc pathology[;] however, this may not necessarily be disc pathology which is abnormal in the population base as a whole, considering a 42 year old male. * * * As mentioned above, I do not consider the patient a candidate for microlaminectomy surgery."

**{¶ 25}** On February 27, 1997, Dr. Rea responded:

**{¶ 26}** "I think that many of the things that Dr. Bender said I agree with. The chance of Mr. Neal having a significant relief of his pain and returning to work at the same job is very low. This is not just because the surgery wouldn't be effective but because it has taken so long for this to get done that he has developed a chronic pain problem. He also has a rather small herniated disc or disc protrusion at L5-S1. In my opinion, this fits with the symptoms that he gave me and I found an asymmetric reflex.

**{¶ 27}** "There is no question in my mind that Mr. Neal may not get better with surgery. I think this has less to do with the pathology and has more to do with the time that's been spent waiting to take care of him. However, I think it's reasonable to consider surgery in him because he has a history and has findings that I think are consistent with a radiculopathy secondary to disc disease. As you know, this doesn't mean he will get better, it just means that it is a reasonable option.

**{¶ 28}** "If Mr. Neal and you feel the need to continue trying to get surgery approved for him, then that if [*sic*] his decision. I think surgery is a reasonable option but if they absolutely refuse to have surgery, then he has to make a decision.

The other option that I outlined for him was a nonsurgical option and he can follow that option.

{¶ 29} "His is a difficult problem and he has to make a decision on what direction he wants to go. Unfortunately, as I said[,] the delay in getting all of this done makes it unlikely that almost anything we do will have any sort of positive results."

{¶ 30} Based on Dr. Bender's report, Osco refused to authorize surgery, prompting claimant to move that appellee Industrial Commission order Osco to authorize it. The commission complied.

{¶ 31} Osco commenced an action in mandamus before the Court of Appeals for Franklin County, alleging that the commission had abused its discretion in issuing the order. Claimant has undergone the surgery and received temporary total disability compensation. Osco would be entitled to reimbursement if the commission's order was an abuse of discretion. R.C. 4123.512(H). The court of appeals denied the writ and Osco has appealed as a matter of right.

{¶ 32} A single issue arises: Does Dr. Rea's February 27, 1997 report support the commission's order for authorization of surgery? Osco assails the report as (1) influenced by nonallowed conditions and (2) equivocal and contradictory on the question of the probability that surgery would improve the claimant's condition. We disagree, and find that the report is indeed evidence supporting the commission's order.

{¶ 33} Osco's first assertion derives from Dr. Rea's statement that "it's reasonable to consider surgery in him because he has a history and has findings that I think are consistent with a radiculopathy secondary to disc disease." Osco additionally notes that Dr. Bender found disc degeneration at L5-S1, and that Dr. Rea agreed with "many things that Dr. Bender said." From these comments, Osco accuses Rea of recommending surgery on the basis of degenerative disc disease— a nonallowed condition.

**{¶ 34}** The court of appeals dismissed Osco's interpretation as "tortured," and we agree. Osco's argument requires a leap that the appellate court legitimately refused to make, *i.e.,* that Dr. Rea agreed specifically with Dr. Bender's finding of disc degeneration. The magistrate's report—as adopted by the court of appeals—instead inferred that the reference to "disc disease" was more a generic reference to a disorder than a definitive diagnosis. We agree with the magistrate's assertion that Rea's isolated reference to "disc disease" did not transform an opinion that in all other respects spoke solely of the allowed condition of ruptured disc into one recommending surgery on the basis of a nonallowed condition. After all, that same report indicated that claimant "has a rather small herniated disc or protrusion at L5-S1 * * * [that] fit[s] with the symptoms he gave me." Since those symptoms were the ones that surgery was meant to correct, the commission did not abuse its discretion in concluding that Dr. Rea's opinion did not include consideration of nonallowed conditions.

**{¶ 35}** In making its second allegation, Osco accuses Dr. Rea of equivocation and contradiction by comparing Dr. Rea's repeated references to the reasonableness of surgery against his pessimism that *any* relief would ensue. We again agree with the appellate court, construing Dr. Rea's statement as a simple reluctance to absolutely guarantee success. We do not find it to be equivocal or contradictory.

**{¶ 36}** Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

————————————

*Taft, Stettinius & Hollister, L.L.P., Robert S. Corker* and *Joseph A. Rectenwald*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Michael A. Vanderhorst*, Assistant Attorney General, for appellee Industrial Commission of Ohio.

*Marchese & Monast* and *James P. Monast*; *Whiteside & Whiteside* and *Alba L. Whiteside*, for appellee Gary Neal.

_____